UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CHRISTOPHER FOGLIA,

      Plaintiff,

v.                             Case No:   2:17-cv-97-FtM-99MRM

RELIANCE STANDARD LIFE
INSURANCE COMPANY,

      Defendant.

_____/

**REPORT AND RECOMMENDATION**

Pending before the Court are Defendant's Motion for Summary Judgment, construed as a Motion for Judgment on the Record and filed on October 13, 2017 (Doc. 25); the Response in Opposition thereto, filed on November 16, 2017 (Doc. 30); Plaintiff's Motion for Summary Judgment, construed as a Motion for Judgment on the Record and filed on October 13, 2017 (Doc. 26); and the Brief in Opposition thereto, filed on November 16, 2017 (Doc. 31).  For the reasons stated below, the Court respectfully recommends that Defendant Reliance's Motion for Summary Judgment (Doc. 25), construed as a Motion for Judgment on the Record, be **GRANTED** and that Plaintiff's Motion for Summary Judgment (Doc. 26), also construed as a Motion for Judgment on the Record, be **DENIED**.[1]

---

[1]  The parties entitled their respective motions as motions for summary judgment.  (*See* Doc. 25, 26).  Pursuant to a subsequently filed Joint Motion (Doc. 28), the parties corrected the titles of these motions.  Further, given the unique considerations present in an ERISA benefit denial case, the standard summary judgment considerations do not apply.  *See Hert v. Prudential Ins. Co. of Am.*, 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009).

## I.    Background

This is an action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*  (Doc. 1 at 1 ¶ 1).  Plaintiff, Christopher Foglia, alleges that Defendant, Reliance Standard Life Insurance Company ("Reliance"), wrongfully terminated his benefits under a long-term disability insurance policy ("LTD").  (Doc. 26 at 1).  Reliance claims that the decision to deny Plaintiff's claim is correct, that the decision is reasonably supported by substantial evidence of record, and that Plaintiff failed to satisfy his burden of proving entitlement to the benefits he seeks.  (Doc. 25 at 1).

### A.    Procedural History

Reliance issued a group long-term disability policy ("Policy" or "LTD Policy") to Realogy Group, LLC, where Plaintiff worked as a Senior Vice President.  (AR at 232, 337, 340-41).[2]  By virtue of his employment, Plaintiff was a participant of the LTD Policy.  (*Id.* at 9).  The Policy is governed by ERISA.  (Doc. 1 at 2 ¶ 6; Doc. 25 at 1).  Plaintiff stopped working due to alleged disabling medical conditions in August 2013 and submitted a claim under the Policy.  (Doc. 25 at 1 (citing AR at 330-38)).  For the initial Elimination Period comprised of the first twenty-four (24) months for which benefits are payable, the Policy defines "Totally Disabled" and "Total Disability" as "an Insured cannot perform the material duties of his/her Regular Occupation."  (AR at 12).  After Plaintiff satisfied his burden of showing that he was totally disabled under the Policy, Reliance began to pay benefits effective February 9, 2014, comprising approximately 60% of Plaintiff's prior salary less estimated Social Security benefits.  (*Id.* at 232-33).

---

[2] "AR" refers to the Administrative Record (Doc. 18).

Issues arose when the "Elimination Period" ended.  After the twenty-four (24) month "Elimination Period," the Policy changes the definition of "Totally Disabled" and "Total Disability" to "an Insured cannot perform the material duties of *Any Occupation*.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time [sic] basis."  (*Id.* at 12 (emphasis added)).  The Policy also defines "Any Occupation" to mean, "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training[,] or experience."  (*Id.* at 11).  The Policy specifically mentions that "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period."  (*Id.* at 25).  Further, when Plaintiff received his benefits, Reliance notified him that "[a]n investigation will begin prior to this date in order to gather the necessary information to determine your continued eligibility for LTD benefits."  (*Id.* at 233).

Here, after the initial twenty-four (24) month period and based on its investigation, Reliance informed Plaintiff by letter dated March 31, 2016 that he was no longer eligible for long-term disability benefits pursuant to the Policy beyond February 9, 2016.  (*Id.* at 293-300). Plaintiff appealed this initial determination and, by a letter dated February 2, 2017, Reliance informed Plaintiff that its initial decision to terminate Plaintiff's long-term disability benefits was appropriate.  (*Id.* at 313-26).

**B.     Medical History**[3]

Physicians diagnosed Plaintiff with a myriad of ailments at the outset of Plaintiff

receiving long-term disability benefits, such as acute liver failure "in the setting of human

immunodeficiency virus (HIV)."  (*Id.* at 295).  On December 10, 2013, Dr. Michael Duffy

completed an Attending Physician's Statement ("APS") that "reported primary diagnoses of

HIV, acute hepatic failure, and pancreatitis."  (*Id.* at 294-95).  On February 14, 2014, Plaintiff

saw Dr. Duffy who documented Plaintiff's diagnoses of hepatitis C, cirrhosis, HIV,

encephalopathy, acute psychosis, anxiety, and delusional behavior with rapid short-term memory

issues.  (*Id.* at 295).  Plaintiff reported bleeding from his left ear and nosebleeds, lasting four

days.  (*Id.*).

On July 24, 2015, Dr. Duffy wrote a letter detailing Plaintiff's current medical status at

that time.  (*Id.* at 297).  Dr. Duffy found:

1.  HIV
2.  Hepatitis C - remission, status-post Sovaldo and Ribavirin treatment
3.  End-stage liver disease
4.  Secondary syphilis
5.  Dumping syndrome, moderate to severe
6.  Encephalopathy with short-term memory loss
7.   Thrombocytopenia secondary to end-stage liver disease as a consequence of HIV, Hepatitis C, protracted STDs and the need for hepatotoxic medications to manage HIV
8.  Peripheral vascular disease
9.  Renal insufficiency
10.  Endocrinopathy with hypertestosteronism
11.  GI bleed and sinusoid bleed secondary to coagulopathies.
12.  Severe lethargy, multi factorial comorbidities as noted above.

(*Id.* at 297, 580).  In this letter, Dr. Duffy noted that Plaintiff's HIV was in a "non-detectable

status" and his hepatitis C had been successfully treated and was in remission.  (*Id.*).  Further, Dr.

_____

[3]  The Court focuses on the medical records cited by both parties in their Motions.  (*See* Doc. 25; Doc. 26).

Duffy noted that Plaintiff's secondary syphilis was also in remission.  (*Id.*).  Plaintiff continued treatment for HIV.  (*Id.*).  Dr. Duffy opined that Plaintiff was "unable to work due to a high risk exposure to infections, end-stage liver disease, bleeding risk, major depression/anxiety disorder, encephalopathy with short-term memory loss, dumping syndrome secondary to HIV, and severe lethargy."  (*Id.* at 297, 580-81).  Dr. Duffy submitted an update to Reliance indicating that Plaintiff's diagnosis remained the same and Reliance found Plaintiff's February 18, 2016 laboratory test results for CFD4 count and viral load to be within normal limits.  (*Id.*).

On April 22, 2016, Plaintiff saw Brent M. Myers, M.D.  (*Id.* at 1673).  Dr. Myer's impression was that Plaintiff had "hepatitis C. genotype 1a with cirrhosis – sustained viral response after Sovaldi/ribavirin combination," HIV, hepatic encephalopathy, history of syphilis, and chronic diarrhea.  (*Id.*).  Dr. Myers found Plaintiff's liver disease was complicated by hepatic encephalopathy and is troubled by fatigue and recurrent diarrhea.  (*Id.*).  Dr. Myers changed Plaintiff's medications, ordered an abdominal ultrasound, and scheduled him for an esophagogastroduodenoscopy.  (*Id.* at 1674).  Dr. Myers advised Plaintiff not to drive due to his hepatic encephalopathy.  (*Id.*).  Dr. Myers confirmed his impression and recommendation in a letter dated May 4, 2016.  (*Id.* at 1688).

On August 10, 2016, Dr. Myers drafted a letter concerning Plaintiff's medical condition.  (*Id.* at 1714).  Dr. Myers basically reiterated his earlier findings, but added that Plaintiff's "liver disease had been complicated by hepatic encephalopathy, causing confusion."  (*Id.*).  Dr. Myers summarized Plaintiff's condition as follows:  Plaintiff's hepatitis C virus was successfully cleared with treatment, but Plaintiff was left with cirrhosis.  (*Id.*).  The cirrhosis causes significant fatigue, impairing Plaintiff's ability to work.  (*Id.*).  In addition, Plaintiff will be "troubled by hepatic encephalopathy, causing confusion and difficulty performing tasks

requiring mental concentration." (*Id.*). Further, Plaintiff's coagulopathy and thrombocytopenia, complications of cirrhosis and portal hypertension, will make Plaintiff prone to bleeding episodes. (*Id.*). Finally, Dr. Myers found Plaintiff "has the debilitating effects of HIV infection." (*Id.*).

### C.   Social Security Decision

Plaintiff filed an application for a period of disability and disability insurance benefits. (*Id.* at 1853). Administrative Law Judge William G. Reamon ("ALJ") entered a decision on January 4, 2017. (*Id.* at 1862). The ALJ found that Plaintiff had the severe impairments of chronic liver disease and cirrhosis, HIV, recurrent arrhythmias, affective disorders, and anxiety disorder. (*Id.* at 1855). After considering the evidence of record, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work, except as follows:

> The claimant can occasionally carry a maximum of 10 pounds; stand for 0-3 hours in an 8[-]hour workday; sit 1-3 hours in an 8[-]hour workday; walk for 1-3 hours in an 8[-]hour workday; frequently bend, squat, climb, and use feet; can understand remember, and carry out simple instructions; can tolerate occasional general public interaction; can tolerate occasional work setting/process adjustments; is unable maintain attention/concentration for the 2 hours blocks of time between standard breaks and meal periods; and is unable to complete a normal workday/workweek without interruptions from psychologically based symptoms.

(*Id.* at 1856). The ALJ noted that on September 18, 2014, Dr. Camillia Clark determined that testing results showed Plaintiff to be intellectually functioning in the low average to average range. (*Id.* at 1857). The ALJ credited Plaintiff's statements that he has chronic daily confusion, chronic daily fatigue, frequent diarrhea and bathroom use, loss of muscle tone, bleeding issues, waiting for liver transplant, weight loss, poor memory and concentration, depression, anxiety, inability to sit, stand or walk for an appreciable period of time, difficulty with his activities of daily living, and an inability to sustain full-time work. (*Id.* at 1858). After consultation with a

vocational expert, the ALJ determined that Plaintiff was unable to perform his past relevant work and found that no jobs exist in the national economy that Plaintiff can perform. (*Id.* at 1861).

### D.    Vocational Reports

Both parties engaged vocational experts to determine which jobs, if any, Plaintiff was capable of performing. A summary of their reports follows.

### 1.    Reliance's Residual Employability Analysis

Reliance received a report from a member of its Vocational Department who reviewed Plaintiff's entire claim file and conducted a Residual Employability Analysis ("REA") on March 24, 2016. (*Id.* at 323, 1549-51). The REA found Plaintiff had the following current diagnosis: HIV; Hepatitis C cirrhosis and thrombocytopenia; depression and anxiety; and pacemaker placement. (*Id.* at 1549). The REA concluded Plaintiff was capable of light restrictions and limitations. (*Id.*). The Vocational Rehabilitation Specialist, Carol Vroman, determined that Plaintiff can perform the following occupations: (1) Vice President, DOT # 189.117-034, SVP 8, sedentary exertional level; (2) Contract Administrator, DOT # 162.117-014, SVP 8, sedentary exertional level; (3) Contract Specialist, DOT # 162.117-018, SVP 7, light exertional level; (4) Manager, Vehicle Leasing and Rental, DOT # 187.167-162, SVP 8, light exertional level; and (5) Sales Representative, Franchise, DOT # 251.357-022, SVP 5, light exertional level.[4] (*Id.* at 1550). Ms. Vroman stated, "Please note this profile was completed based on physical restrictions and limitations as requested by the Examiner. Any restrictions as a result of his psychiatric condition were not considered." (*Id.* at 1551).

---

[4] "DOT" refers to the U.S. Dep't of Labor. Bureau of Statistics. (1991). *Dictionary of Occupational Titles* (4th ed.). Washington, DC: U.S. Gov't Printing Office.

### 2.    Plaintiff's Vocational Analysis

Plaintiff's Vocational Consultant, Linda Hayes, completed a Vocational Analysis on September 22, 2016.  (*Id.* 1728-1740).  Ms. Hayes analyzed Plaintiff's present job requirements as well as the job requirements for the other jobs proposed by Reliance's vocational expert, Ms. Vroman.  (*Id.* at 1734-39).  Ms. Hayes found that Plaintiff's prior work as a Senior Vice President at Realogy Group LLC required a high level of cognitive functioning and falls within the sedentary exertional level.  (*Id.* at 1730).  Ms. Hayes reviewed the job description from Realogy Group LLC for this position and Plaintiff's key responsibilities in that job.  (*Id.*).  After a review of Plaintiff's medical records, Ms. Hayes considered Reliance's finding that Plaintiff was capable of performing the sedentary exertional level positions of Vice President and Contract Administrator as well as the other jobs listed by Reliance in Ms. Vroman's report at a light exertional level.  (*Id.* at 1734).  Ms. Hayes determined that for the sedentary positions, Plaintiff's cognitive deficits, memory issues, stammer/stutter, concentration issues, and fatigue would limit him from performing these occupations.  (*Id.* at 1734-38).  For example, for the position of Vice President—sedentary, Ms. Hayes found Plaintiff limited as to computer use, judgment and decision-making, complex problem solving, critical thinking, speech clarity, communicating with persons outside the organization, and dependability.  (*Id.* at 1734).  Ms. Hayes concluded that Mr. Foglia was unable to perform "the essential tasks of any position that falls within the sedentary strength level of work."  (*Id.* at 1739).

Further, Ms. Hayes found that Plaintiff's significant cognitive impairments "would disqualify him from any occupation [that] required a high level of cognitive functioning.  His speech issues would preclude him from any occupation requiring a high level of interpersonal communication."  (*Id.* at 1740).  In addition, Ms. Hayes found that Reliance's list of alternate

occupations takes into account Plaintiff's transferrable skills, but does not "consider the extensive amount of cognitive functioning that [is] essential [to] tasks of these occupations.  Mr. Foglia['s] own occupation of Vice President requires almost the identical essential duties of the suggested alternative occupations. . . .  He is precluded from performing any activity involving high levels of cognitive functioning or driving[.]"  (*Id.*).  Ms. Hayes also determined that Plaintiff cannot meet the minimum physical demand levels for sedentary work.  (*Id.*).  Further, Ms. Hayes concluded that, "[d]ue to [Plaintiff's] medical conditions he is unable to perform with reasonable continuity the material duties of any occupation."  (*Id.*).

      **E.**      **Reliance's Peer Review Report and Neuropsychological Evaluation**

Reliance engaged independent medical professionals to complete a Peer Review Report and a Neuropsychological Evaluation.  (*Id.* at 1799-1806; 1864-1873).  A summary of these reports follows.

      **1.**      **Peer Review Report by Dr. Danzig**

On October 31, 2016, Jeffrey B. Danzig, M.D. completed a Peer Review Report.  (*Id.* at 1799-1806).  After a review of Plaintiff's medical records, Dr. Danzig determined that based on physical findings alone, Plaintiff showed some impairment.  (*Id.* at 1803).  Dr. Danzig found the following.  Plaintiff's cirrhosis "may likely contribute to fatigue, with or without the presence of hepatic encephalopathy."  (*Id.*).  Plaintiff's orthopedic complaints and cardiac conditions do not seem to warrant limitations and restrictions.  (*Id.* at 1803-1804).  Plaintiff's diagnosis was cirrhosis secondary to hepatitis C and ETOH abuse, hepatic encephalopathy, esophageal varices, and gastric varices.  (*Id.* at 1804).  "The diagnosis of hepatic encephalopathy has been based on clinical grounds with fatigue and cognitive issues in the setting of cirrhosis."  (*Id.*).  Dr. Danzig concluded:

> The claimant could work full-time from 2/9/16 through the present.  He can lift 10 pounds regularly and up to 25 pounds occasionally.  He can stand or walk for a total of 2 hours of an 8[-]hour day.  The claimant has cirrhosis which certainly is a reasonable cause of fatigue.  He therefore should be limited in his lifting, carrying, standing[,] and walking.  However his cirrhosis is compensated.  He has no ascites and his MELD score is only 12.  The claimant's cardiac evaluation was normal.  The claimant's orthopedic complaints would not impair the claimant from performing full-time activities within the restrictions noted from an internal medicine perspective.  Whether or not his cognitive issues are related to hepatic encephalopathy or to anxiety/depression is unclear and difficult to sort out.  What if any restrictions he should have from a neuropsychiatric point of view is out of my area of expertise.

(*Id.*).  These limitations fit within the sedentary level of exertion.  (*Id.*).  Dr. Danzig added that Plaintiff could work full-time from February 9, 2016 through the present, but Plaintiff's prognosis is guarded.  (*Id.* at 1805).  Dr. Danzig found that Plaintiff may stay in this state of health for a long time, but at any point, his cirrhosis may decompensate, which would lead to complications such as bleeding and ascites, and would require additional restrictions.  (*Id.*).  Dr. Danzig also opined that Plaintiff's current level of restrictions is unlikely to be lessened.  (*Id.*).  Finally, Dr. Danzig found that Plaintiff's HIV does not – at present – impact Plaintiff's functionality.  (*Id.*).

## 2.    Neuropsychological Evaluation by Dr. Arias

On January 6, 2017, Alejandro J. Arias, Psy. D. conducted a Neuropsychological Evaluation of Plaintiff.  (*Id.* at 1864-73).  The reason for the referral was to assess Plaintiff's current emotional and cognitive functioning.  (*Id.* at 1864).  Dr. Arias found Plaintiff cooperative and motivated throughout the examination.  (*Id.* at 1869).  Dr. Arias found Plaintiff in the average range for Verbal Comprehension, Perceptual Reasoning, Working Memory, and Full-Scale IQ, but in the low range for Processing Speed Index.  (*Id.* at 1870).  Dr. Arias also found Plaintiff in the average range for attention and memory.  (*Id.*).  As to Executive Skills, Dr. Arias determined that Plaintiff's Conceptual Reasoning was low average, Nonverbal abstract reasoning

was low average, Visual Psychomotor Speed and Rapid Scanning was average, and Color

Number Set Shifting was average. (*Id.*). Dr. Arias determined Plaintiff's reasoning ability and

problem-solving skills to be average. (*Id.* at 1870-71).

Dr. Arias' impression was that Plaintiff performs within an estimated average range for

emotional and cognitive functioning. (*Id.* at 1871). Dr. Arias noted that Plaintiff had no

significant impairment. (*Id.*). But, Dr. Arias found a generalized weakness with abstract

reasoning and nonverbal abstract reasoning. (*Id.*). Overall, Dr. Arias found that Plaintiff fell

within the average to high-average range. (*Id.*). Dr. Arias reiterated that Plaintiff showed good

effort throughout the testing and that there were no signs of malingering. (*Id.*). Dr. Arias found

that overall:

> Mr. Foglia presents with a pattern of selected nonspecific neuropsychological
> findings, which are not consistent with a known neurocognitive syndrome. There
> are [] select areas of generalized attentional deficits that are contributory to his
> memory difficulties. As mentioned, immediate and delayed nonverbal memory
> was average. New verbal learning was average. Delayed verbal memory was also
> average.

(*Id.* at 1872). Dr. Arias acknowledged that Plaintiff believed that his memory impairments "are

directly related to elevated ammonia levels" and that Dr. Arias deferred commentary on any of

Plaintiff's medical conditions to a physician. (*Id.*) Dr. Arias determined that Plaintiff had no

"indications of any objective or variable test data that would indicate work restrictions" and

"[t]here are no neuropsychological restrictions or limitations for return to work." (*Id.* at 1873).

Dr. Arias concluded, "[a]t this time, there are no objective and variable neuropsychological test

impairment that would indicate impairments. However, the majority of Mr. Foglia's

symptomatology appeared to be related to his physical condition. All medical commentary is

deferred to a physician." (*Id.*).

Dr. Arias completed a check-box form indicating that Plaintiff was not limited in these areas:  (1) directing, controlling, or planning activities with others; (2) performing repetitive or short cycle work; (3) influencing people in their opinions, attitudes, and judgments; (4) performing a variety of duties; (5) expressing personal feelings; (6) working alone or apart in physical isolation with others; (7) performing effectively under stress (from a neuropsychological standpoint only); (8) attaining precise set limits, tolerances, or standards (from a neuropsychological standpoint only); (9) working under specific instructions; (10) dealing with people; and (11) making judgments and decisions.  (*Id.* at 1874-75).  Each of these topics has additional explanations below their titles.  (*Id.*).  For example, in the box with directing, controlling, or planning activities with others, the definition includes:  "Work situations where accepting responsibility for formulating plans, designs, practices, policies, methods, regulations, and procedures for operations or projects; negotiating with individuals or groups for agreements or contracts; and supervising workers to implement plans and control activities."  (*Id.* at 1874).

## II.     ERISA Review Standard

In its prior Order (Doc. 32), the Court set forth the standard of review in cases filed pursuant to ERISA.  (Doc. 32 at 1-2).  The Court recites it again here.  ERISA itself provides no standard of review for judicial review of the benefits decisions of plan administrators or fiduciaries.  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  Based on the Supreme Court's guidance in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 109 and *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), however, the Eleventh Circuit developed a multi-step framework to guide courts in reviewing ERISA plan administrator's benefits decisions.

*Blankenship*, 644 F.3d at 1354.  The first five steps have remained unchanged since the 2004

decision in *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004),

*overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352

(11th Cir. 2008).  *Blankenship*, 644 F.3d at 1354-55.  However, the sixth step – concerning a

conflict of interest – reflects a change in the standard of review based upon the Supreme Court

decision in *Glenn*, cited *supra*.  *Blankenship*, 644 F.3d at 1354-55.

When a court reviews a plan administrator's benefits decision, a court must follow the

following steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* 644 F.3d at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir.

2010)).

The Court is limited to the record that was before Reliance when it made its decision.

*Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008).  In an ERISA

action, the insured bears the burden of proving that he or she is disabled.  *Carr v. John Hancock Life Ins. Co. (USA)*, 703 F. App'x 733, 741 (11th Cir. 2017) (citing *Glazer*, 524 F.3d at 1247).[5]

## III.    Discussion

The parties do not dispute that Plaintiff suffers from the multitude of conditions set forth above.  Instead, the parties dispute whether these conditions cause Plaintiff to be unable to perform the material duties of "any occupation" as defined in the Policy and, thus, whether Reliance's decision to terminate Plaintiff's long-term benefits was wrong and/or an abuse of discretion.  Pursuant to the Eleventh Circuit's framework as set forth in *Blakenship*, the Court first addresses whether Reliance's decision was *de novo* wrong and then, if necessary, proceeds through the other steps of the analysis.

### A.    *De Novo* **Review of Reliance's Decision**

At the first step, the Court must assess whether Reliance's decision to deny Plaintiff long-term benefits was wrong under the *de novo* standard of review.  The decision is wrong if the Court disagrees with that decision.  *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1196 (11th Cir. 2010).  "Review of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." *Blankenship*, 644 F.3d at 1354.  If the decision is correct, the analysis ends and the Court grants judgment in favor of the administrator.  *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 673 (11th Cir. 2014).

---

[5] Unpublished opinions may be cited as persuasive on a particular point.  The Court does not rely on unpublished opinions as precedent.  Citation to unpublished opinions on or after January 1, 2007 is expressly permitted under Rule 31.1, Fed. R. App. P.  Unpublished opinions may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

Some Policy terms are central to Reliance's determination and bear repeating here.  The Policy provides that the terms "Totally Disabled" and "Total Disability" after the first twenty-four (24) month elimination period mean:  "an Insured cannot perform the material duties of Any Occupation" and "'Any Occupation' means an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience."  (AR at 11, 12).  The Court must also keep in mind that under the Policy, Reliance will pay monthly benefits if, *inter alia*, Plaintiff "submits satisfactory proof of Total Disability to [Reliance]."  (*Id.* at 21).  Thus, under the Policy and case law, the burden is on Plaintiff to show total disability.  (*Id.*); *see Carr*, 703 F. App'x at 741.  In addition, the "any occupation" standard is not particularly demanding and only requires a finding that a plaintiff can perform any job, for which he is, or may become, qualified by education, training, or experience.  *Schindler v. Metro. Life Ins. Co.*, 141 F. Supp. 2d 1073, 1082 (M.D. Fla. 2001).

Against this backdrop, the Court considers Reliance's decision.  Both parties contend that they are entitled to judgment on the administrative record under the *de novo* standard.  (Doc. 26 at 11; Doc. 25 at 5).  Although Plaintiff argues that Reliance is *de novo* wrong for many reasons, Plaintiff's actual arguments mainly revolve around Plaintiff's ability to perform the duties of any occupation.  (Doc. 26 at 11-20).  Plaintiff argues, *inter alia*, that Reliance improperly:  (1) showed deference to its prior adverse determination; (2) discredited Plaintiff's treating physician opinion that found him disabled; (3) discounted its own experts, Dr. Danzig and Dr. Arias; (4) ignored the Social Security Administration's fully favorable decision that Plaintiff is disabled; and (5) relied on its own vocational expert who did not have the benefit of either Dr. Danzig's or Dr. Arias' opinions.  (*Id.*).

Conversely, Reliance argues that its decision was *de novo* correct because Plaintiff failed to prove he was totally disabled within the terms of the Policy during the relevant period, Reliance's medical staff reasonably concluded that Plaintiff was not disabled under the Policy, and the vocational evidence supports Reliance's determination.  (Doc. 25 at 8-19).

The Court addresses each of Plaintiff' five (5) arguments in logical groupings.  To be clear, the Court considers the reasonableness of Reliance's final decision only.  *See Till v. Lincoln Nat'l Life Ins. Co.*, 678 F. App'x 805, 808 n.2 (11th Cir. 2017) ("This Court, in line with several other Circuit Courts of Appeal, will consider only the reasonableness of an administrator's final decision.").

### 1.      Deference

Plaintiff argues that Reliance is *de novo* wrong because it gave deference to its prior adverse determination.  (Doc. 26 at 11).  Specifically, Plaintiff claims that Reliance relied on the prior opinion of its Medical Staff in determining that Plaintiff was no longer entitled to LTD benefits.  (*Id.*).  Plaintiff cites the following language in Reliance's decision:  "In conclusion, we agree with Dr. Jeffrey Danzig and Dr. Alejandro Arias' independent assessment of your client's restrictions and limitations, as their opinion reflects the available medical information on file *as well as the prior opinion of our Medical Staff who also opined your client was capable of performing a minimum of sedentary work*."  (AR at 1887 (emphasis added)).  Plaintiff claims that this language establishes that Reliance violated 29 C.F.R. § 2560.503-1(h)(3)(ii), which provides in relevant part:

> (3) Group health plans.  The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraphs (h)(2)(ii) through (iv) of this section, the claims procedures—

> (i) Provide claimants at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;
> (ii) Provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.

29 C.F.R. § 2560.503-1(h)(3)(i-ii).

The Court is not persuaded by Plaintiff's argument.  Reliance clearly states in its letter that, after a review, it agrees with the independent assessments by Dr. Danzig and Dr. Arias concerning Plaintiff's restrictions and limitations, which assessments reflect the available medical information on file.  (AR at 324).  It is clear, therefore, that Reliance did not simply afford deference to the initial adverse benefit determination, as Plaintiff suggests.  Reliance's further reference in the same sentence to the prior opinion of its Medical Staff "who also opined" that Plaintiff was capable of performing minimum sedentary work does not alter this conclusion because that reference is clearly tethered to Reliance's review and consideration of the independent assessments of Dr. Danzig and Dr. Arias.  Accordingly, the Undersigned finds that Reliance did not afford deference to its initial adverse benefit determination.

### 2.      Medical Evidence of Record

The medical records address two (2) components of Plaintiff's ability to perform work at a sedentary level—specifically, Plaintiff's exertional abilities, and Plaintiff's non-exertional abilities.  The Court addresses each of these components separately.

### a.      Sedentary Strength/Exertional Level

Plaintiff argues that Reliance discredited Plaintiff's own treating physicians and discounted its own experts in reaching its decision that Plaintiff can perform work at the sedentary level.  (Doc. 26 at 12-16).  Plaintiff argues that the medical evidence supports a finding that Plaintiff continues to be disabled from any occupation.  (*Id.* at 11).

17

Reliance argues that even though Plaintiff has been diagnosed with many illnesses, the issue is whether his condition is totally disabling. (Doc. 25 at 8-9). Reliance claims that Plaintiff's own medical records and two independent medical sources found Plaintiff not disabled under the Policy. (*Id.* at 11-17).

Plaintiff's treating physician, Dr. Duffy, diagnosed Plaintiff on July 24, 2015 with HIV, Hepatitis C in remission, end-stage liver disease, secondary syphilis, dumping syndrome, encephalopathy with short-term memory loss, thrombocytopenia secondary to end-stage liver disease, peripheral vascular disease, renal insufficiency, endocrinopathy with hypertestosteronism, GI bleed and sinusoid bleed, and severe lethargy. (AR at 297). Dr. Duffy opined that Plaintiff was unable to work due to the risk of exposure to infections, end-stage liver disease, bleeding risk, major depression/anxiety disorder, encephalopathy with short-term memory loss, dumping syndrome, and severe lethargy. (*Id.*). In his Peer Review, Dr. Danzig closely reviewed Dr. Duffy's medical records when formulating his opinion that Plaintiff can work at the sedentary level. (*Id.* at 1801-1802). Reliance relied heavily on Dr. Danzig's opinion when reaching its decision. (*Id.* at 320-21). Further, in the context of considering the Social Security decision, Reliance considered Dr. Duffy's treatment notes from March 2014 through October 2015 and a letter dated March 14, 2016 from Dr. Duffy. (*Id.* at 325). Reliance found that they offer limited information in evaluating the presence or absence of impairments as of February 9, 2016. (*Id.*).

Another of Plaintiff's treating physicians, Dr. Myers, found Plaintiff's liver disease was complicated by hepatic encephalopathy, causing trouble with fatigue. (*Id.* at 1673). Dr. Myers advised Plaintiff to stop driving due to the hepatic encephalopathy, which causes confusion. (*Id.* at 1674, 1714). Dr. Myers found Plaintiff's cirrhosis impairs Plaintiff's ability to work, causing

confusion and difficulty performing tasks requiring mental concentration. (*Id.* at 1714). And, Dr. Myers found Plaintiff subject to bleeding episodes. (*Id.*). Reliance summarized and considered Dr. Myers' progress notes, but again relied heavily on Dr. Danzig's opinion. (*Id.* at 317, 319-21).

Reliance found that Plaintiff's medical records do not support a finding of Total Disability from Any Occupation beyond February 9, 2016. (*Id.* at 319). To reach this conclusion, Reliance relied on Dr. Danzig's review of Plaintiff's entire medical claim file. (*Id.* at 320). Based upon Dr. Danzig's review of the medical records, Dr. Danzig determined that Plaintiff could physically work full-time from February 9, 2016 through the present. (*Id.*). Dr. Danzig found Plaintiff was capable of performing work at the sedentary exertional level with the caveat that Plaintiff's cirrhosis can certainly cause fatigue and, thus, limited Plaintiff's lifting, carrying, standing, and walking. (*Id.* at 320).[6]

Here, Plaintiff's medical providers found Plaintiff, at a minimum, impaired in his ability to work and, at a maximum, unable to work. (*Id.* at 297, 1714). This evidence conflicts with Reliance's independent medical examiner, Dr. Danzig, as to Plaintiff's exertional abilities. (*Id.* at 320, 325). When conflicting evidence exists, a plan administrator is entitled to weigh the evidence and resolve conflicting evidence about a plaintiff's disability. *Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 977 (11th Cir. 2008) (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997)). Further, plan administrators have no requirement to automatically "accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of

---

[6] Dr. Danzig found the following: (1) Plaintiff was capable of lifting 10 pounds regularly and up to 25 pounds occasionally; and (2) Plaintiff can stand or walk for a total of 2 hours in an 8-hour day. (AR at 320).

explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Here, Reliance weighed the evidence and found Dr. Danzig's opinions more persuasive than Plaintiff's treating physicians. Reliance determined that based on Dr. Danzig's opinion, Plaintiff can perform work at a sedentary exertional level. Accordingly, the Undersigned finds that Reliance is not *de novo* wrong in determining that Plaintiff can perform work at the sedentary strength/exertional level.

### b.      Non-Exertional Limitations[7]

Plaintiff argues that the report by Reliance's own neurological expert – Dr. Arias – is insufficient to support the cognitive requirements of the sedentary occupations listed by Reliance's vocational expert. (Doc. 26 at 12, 14). Reliance asserts that it obtained an independent medical opinion and a neuropsychological examination and based upon these reports, Plaintiff is capable of performing work at the sedentary level. (Doc. 31 at 6).

The Court first considers the medical evidence of record as it relates to Plaintiff's non-exertional impairments and later turns to the vocational experts' reports. Dr. Duffy, a treating physician, found Plaintiff unable to work due to encephalopathy with short-term memory loss and severe lethargy. (AR at 297). Dr. Myers, another treating physician, found Plaintiff's liver

---

[7] The Court notes that according to the Policy, "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits." (AR at 25). Reliance found that Plaintiff exhausted "any benefits in connection with his psychiatric conditions." (*Id.* at 314). To be clear, when the Court discusses fatigue and cognitive limitations, these limitations stem from Plaintiff's physical condition only and not from any mental or nervous disorders. (*See* AR at 25, 1804).

disease caused significant fatigue and his hepatic encephalopathy causes confusion and difficulty performing tasks that require mental concentration.  (*Id.* at 1673, 1714).

Dr. Danzig, a reviewing independent physician, found that Plaintiff's cirrhosis of the liver is a reasonable cause of fatigue and hepatic encephalopathy "has been based on clinical grounds with fatigue and cognitive issues in the setting of cirrhosis."  (*Id.* at 1804).  Dr. Danzig also stated, that his cirrhosis "is compensated" and recommended that his fatigue be compensated by limiting lifting, carrying, standing, and walking.  (*Id.*).  Dr. Danzig added "[w]hat if any restrictions [Plaintiff] should have from a neuropsychiatric point of view is out of my area of expertise."  (*Id.*).  Dr. Danzig concluded that Plaintiff "could work full-time from 2/9/16 through the present."  (*Id.* at 1805).

Dr. Arias, the examining psychologist, assessed Plaintiff's current emotional and cognitive functioning.  (*Id.* at 1864-73).  Dr. Arias found that Plaintiff performs within an estimated average range for cognitive functioning and shows no significant impairment.  (*Id.* at 1870).  Dr. Arias noted a generalized weakness in abstract and nonverbal abstract reasoning.  (*Id.* at 1871).  Dr. Arias also noted that Plaintiff had generalized attentional deficits that are contributory to his memory difficulties.  (*Id.* at 1872).  Overall, Dr. Arias found Plaintiff to fall within the average to above-average range.  (*Id.* at 1871).

Most telling is that Dr. Arias completed a check-box form, indicating Plaintiff was not limited in the following areas:  (1) directing, controlling, or planning activities with others; (2) performing repetitive or short cycle work; (3) influencing people in their opinions, attitudes, and judgments; (4) performing a variety of duties; (5) expressing personal feelings; (6) working alone or apart in physical isolation with others; (7) performing effectively under stress (from a neuropsychological standpoint only); (8) attaining precise set limits, tolerances, or standards

(from a neuropsychological standpoint only); (9) working under specific instructions; (10) dealing with people; and (11) making judgments and decisions.  (*Id.* at 1874-75).  Thus, Dr. Arias found Plaintiff had no cognitive limitations whatsoever.  In fact, Dr. Arias determined that Plaintiff has "no neuropsychological restrictions or limitations for return to work."  (*Id.* at 1873).

Plaintiff cites to Dr. Arias' testing results in support of his argument that he does not have the cognitive ability to perform the jobs listed by Reliance.  (Doc. 26 at 8).  Plaintiff claims:

> Defendant Reliance Standard concludes that Mr. Foglia, a former Senior Vice President, has suffered no cognitive impairment with these scores, and that he can now work as a Vice President and Contract Administrator despite the fact that these occupations require General Learning Ability and Verbal Aptitude in the Above Average Range with an Aptitude Level of 2, in the 69-89th percentile (and that Vice President also requires Numerical Aptitude Level of 2, in the 69-89th percentile). Reliance Standard's Medical Expert materially misstates the lowest score in a manner which favors Reliance Standard from a Low Processing Speed Index of 83 to an Average Processing Speed Index of 89.

(*Id.* at 8-9).  Plaintiff implies that Reliance reached its conclusions based upon Dr. Arias' testing scores.  (*Id.*).  In fact, Reliance relied on Dr. Arias's *conclusions* from these testing results and the results from Dr. Arias' Neuropsychological Capacities Questionnaire to reach its decision. (AR at 322-23).  Dr. Arias opined that "[b]ased on my current testing, there are no indications of any objective or variable test data that would indicate work restrictions."  (*Id.* at 1873).  Dr. Arias concluded that "[t]here are no neuropsychological restrictions or limitations for return to work."  (*Id.*).  Reliance quoted relevant parts of Dr. Arias' report and questionnaire, to conclude that Plaintiff "appears to be fully functional from an emotional and cognitive standpoint as of February 9, 2016."  (*Id.* at 323).

Keeping in mind that the standard for "Any Occupation" is not particularly demanding, *see Schindler*, 141 F. Supp. 2d at 1082, the Undersigned finds that Reliance is not *de novo* wrong in determining that based upon Plaintiff's non-exertional limitations, Plaintiff can perform the

sedentary occupations listed by Reliance.  Dr. Arias' Neuropsychological Report and

Questionnaire support Reliance's determination that Plaintiff can perform these jobs.  (AR at

1864-75).  Specifically, Dr. Arias found Plaintiff had no neuropsychological limitations to return

to work, and none in the areas listed in the form mentioned above.  Reliance weighed the

conflicting evidence of record and adopted Dr. Arias' opinion that Plaintiff can perform work at

the sedentary level.  (*See id.* at 324).  Thus, the Undersigned finds that Reliance was not *de novo*

wrong that Plaintiff can perform work at the sedentary level, including those specific sedentary

jobs listed by Reliance in its decision.

### c.      Social Security

To support his claim that he is disabled under the terms of the Policy, Plaintiff cites the

fully favorable Social Security decision, which found Plaintiff disabled.  (Doc. 26 at 11).

Reliance argues that a decision by the Social Security Administration is not binding on ERISA

fiduciaries such as Reliance.  (Doc. 31 at 8).  Reliance also argues that unlike ALJs in Social

Security decisions, a claims administrator need not give greater weight to treating physicians,

and the Policy here places the burden on Plaintiff to submit satisfactory proof of disability.  (*Id.*).

A court may consider a Social Security determination of disability when reviewing a plan

administrator's decision.  *Oliver v. Aetna Life Ins. Co.*, 613 F. App'x 892, 897 (11th Cir. 2015).

However, a Social Security determination of disability is not dispositive of whether a plaintiff

satisfies the requirements for disability under the policy at issue.  *Id.*  In evaluating a Social

Security disability claim, the ALJ employs "a complex sequential analysis prescribed by federal

regulations" not found in ERISA cases.  *Id.*  Further, the claims administrator – as in the instant

case – has different information and records than what was available to the ALJ in the Social

Security matter.  *See Ness v. Aetna Life Ins. Co.*, 257 F. Supp. 3d 1280, 1293 (M.D. Fla. 2017).

In its determination, Reliance distinguished the fully favorable Social Security decision, stating that the Social Security decision relied on medical records mainly from the period March 2014 through October 2015, along with a letter from Dr. Duffy dated March 14, 2016, and these records offer limited information "in evaluating the presence or absence of impairment as of the date [Plaintiff] was last paid on February 9, 2016." (AR at 325). Reliance also noted that Social Security decisions are based on different guidelines, which may lead to different conclusions. (*Id.*). Further, Reliance noted that the ALJ did not have the benefit of Dr. Arias' neuropsychological evaluation. (*Id.*). In addition, Reliance pointed out that in the Social Security decision, the ALJ found Plaintiff to have a residual functional capacity to perform sedentary work with limitations and this finding generally matched the exertional limitation of sedentary work found by Reliance. (*Id.* at 325, 1856).

In this case, the Undersigned finds that Reliance properly weighed the fully favorable Social Security decision, but found Dr. Danzig's and Dr. Arias' opinions more persuasive. This Court has also considered the ALJ's decision, but finds that it is not dispositive of whether Plaintiff satisfied the terms of the Policy. In the Social Security decision, the ALJ considered evidence from an earlier period and did not have the benefit of all of Reliance's medical reports at the time of the decision. In addition, unlike Social Security cases, Reliance is not obligated to afford more weight to a treating physicians' opinion in an ERISA case and can rely on independent medical opinions.

Further, in the ALJ's decision – after finding Plaintiff can perform sedentary work with limitations – the ALJ relied on the vocational expert's testimony that an individual with Plaintiff's limitations cannot perform his past relevant work or any work that exists in significant numbers in the national economy. (*Id.* at 1856, 1861). Thus, the ALJ concluded that Plaintiff

"has been under a disability as defined in the Social Security Act since July 22, 2013, the alleged onset date of disability." (*Id.* at 1861). In Social Security cases, "the 'procedure of using vocational experts to show that jobs were available in the national economy that plaintiff was capable of performing is the special creature of social security and has no relevance to an ERISA benefits case.'" *Ness*, 257 F. Supp. 3d at 1293. (quoting *Bailey v. SBC Disability Income Plan*, No. 05-4093, 2007 WL 1805616, at *8 (D. Kan. June 22, 2007)). As such, the ALJ's finding that Plaintiff was totally disabled based on the vocational expert's opinion does not automatically render Plaintiff disabled under the terms of the Policy at issue here. *See Ness*, 257 F. Supp. 3d at 1293.

The Court finds that a Social Security determination of disability applies a different standard from the standard applicable in ERISA cases. Nevertheless, Reliance considered the fully favorable Social Security decision, but found other evidence of record more persuasive, including Dr. Arias' evaluation. Unlike the ALJ in the Social Security proceedings, Reliance had no obligation to afford greater weight to Plaintiff's treating physicians, and Reliance chose to rely on its independent medical professionals over Plaintiff's treating physicians. Further, whether or not Social Security's vocational expert found jobs Plaintiff can perform is irrelevant to whether he is disabled under the terms of the Policy. *Id.* at 1293. Thus, the Undersigned finds that Reliance was not *de novo* wrong in its consideration of Plaintiff's fully favorable Social Security decision.

### d.    Vocational Reports

Plaintiff argues that the report by Reliance's own neurological expert, Dr. Arias, is insufficient to support the sedentary occupations listed by Reliance's vocational expert. (Doc. 26

at 12, 14).  Plaintiff also asserts that his own Vocational Analysis demonstrates that Plaintiff cannot perform the jobs listed by Reliance's vocational expert.  (*Id.* at 14).

Reliance argues that its Vocational Specialist, Carol Vroman, concluded that Plaintiff can perform alternative sedentary occupations.  (Doc. 31 at 7).  Further, Reliance argues that it can accept the findings of its vocational expert over Plaintiff's vocational expert.  (*Id.* at 6).  Finally, Reliance claims that Plaintiff relies on the DOT specifications and Reliance relied upon the Occupational Aptitude Patterns ("OAP") when finding Plaintiff possesses the cognitive ability to perform the jobs listed by Reliance.  (*Id.* at 7).

A claims administrator reviewing benefits eligibility under an "any occupation" standard need not obtain vocational evidence to prove that occupations are available for a plaintiff.  *Richey v. Hartford Life & Accident Ins. Co.*, 608 F. Supp. 2d 1306, 1312 (M.D. Fla. 2009).  Nevertheless, when a claims administrator employs a vocational expert to determine if suitable occupations exist, then the Court looks to whether the defendant was wrong in relying on the results of its employability analysis.  *Id.*  Further, "[c]ourts have recognized a number of actions by an ERISA administrator that indicate the administrator abused its discretion.  For instance, the Supreme Court recognized that in an ERISA disability case, an administrator's failure 'to provide its independent vocation and medical experts with all of the relevant evidence' is a 'serious concern.'"  *Wilson v. Walgreen Income Prot. Plan for Pharmacists & Registered Nurses, Walgreen Co.*, 942 F. Supp. 2d 1213, 1250 (M.D. Fla. 2013) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118-19 (2008)).

Against this backdrop, the Court turns to the vocational experts' reports.  Reliance considered, at least in part, a report from a member of its Vocational Department, Ms. Vroman, who reviewed Plaintiff's entire claim file and conducted a Residual Employability Analysis

26

("REA") on March 24, 2016.  (AR at 323).  Plaintiff argues that Reliance's adoption of the REA was wrong because Ms. Vroman did not have the benefit of Dr. Danzig's Peer Review Report and Dr. Arias' Neuropsychological Evaluation.  (Doc. 26 at 17-18).  Plaintiff also argues that as a result, Ms. Vroman included jobs above the sedentary level and jobs that Plaintiff claims are above his cognitive abilities.  (*Id.* at 15, 17-18).

It is uncontested that Ms. Vroman completed the REA on March 24, 2016 without the benefit of medical opinions from Reliance's own consultative experts:  Dr. Danzig's Peer Review Report dated October 31, 2016; and Dr. Arias Neuropsychological Evaluation of Plaintiff dated January 6, 2017.  (AR at 1549, 1799-1806; 1864-73).  Without the benefit of either of these reports, Ms. Vroman, determined Plaintiff capable of performing the following two occupations at the sedentary level:  Vice President and Contract Administrator; and the following three occupations at the light level: Contract Specialist; Manager, Vehicle Leasing and Rental; and Sales Representative, Franchise.  (*Id.* at 1550).

However, a careful reading of Reliance's final decision establishes that it considered Ms. Vroman's report, but recognized that she did not have the benefit of Dr. Danzig's report or Dr. Arias' evaluation.  (*Id.* at 323).  Rather than rely on Ms. Vroman's report, Reliance determined that:

> As you may recall, a member of our Vocational department previously reviewed Mr. Foglia's entire claim file on March 24, 2016 and conducted a Residual Employability Analysis (REA).  This vocational assessment was completed, at the request of the Claims Department, based upon your client's transferable skills as well as physical restrictions and limitations, which at that time revealed your client was able to perform at a *sedentary-light*[] exertion.  However, as a consequence of this appeal review along with the independent opinions of Dr. Danzig and Dr. Arias, we have concluded your client is able to perform at a sedentary level (without cognitive deficits) on a full-time consistent basis as of February 9, 2016.  Therefore, based upon Mr. Foglia's residual physical capacity in addition to his training, education, or past experience, we maintain that your client continues to qualify for the following occupational alternatives (including his Regular Occupation) of a

27

> sedentary nature:  Vice President, Contract Administrator, Management Analyst, Department Manager, Sales Manager, and Project Director.

(*Id.* (emphasis in original)).  Thus, Reliance did not base its decision on Ms. Vroman's REA. (*Id.*).  Instead, it reviewed the totality of the medical records and the opinions of Dr. Danzig and Dr. Arias to determine that Plaintiff can perform work at a sedentary level and the specifically listed sedentary jobs.  (*Id.* at 323, 324).  Therefore, the Court finds that even though the vocational expert listed jobs outside the sedentary level, Reliance clarified in its final decision that it considered jobs of a sedentary nature only.

Plaintiff also contends that his vocational expert determined Plaintiff cannot perform the jobs listed by Ms. Vroman and, thus, the record did not support Reliance's decision.  (Doc. 26 at 14).  Plaintiff's Vocational Consultant, Linda Hayes, completed a Vocational Analysis on September 22, 2016.  (AR at 1728-1740).  Like Reliance's vocational expert, Ms. Hayes did not have the benefit of Dr. Danzig's Peer Review Report and Dr. Arias' Neuropsychological Evaluation of Plaintiff.  Ms. Hayes relied solely on Plaintiff's treating physicians.  (*Id.*).  Ms. Hayes analyzed Plaintiff's present job requirements as well as the job requirements for the other jobs proposed by Reliance.  (*Id.* at 1734-39).  Ms. Hayes found that Plaintiff's prior work as a Senior Vice President at Realogy Group LLC required a high level of cognitive functioning and fell within the sedentary exertional level.  (*Id.* at 1730).  After a review of the medical records, Ms. Hayes determined that cognitive deficits, memory issues, and concentration issues would limit Plaintiff from being capable of performing the jobs listed in the REA.  (*Id.* at 1734-38).  Ms. Hayes concluded that Plaintiff was unable to perform "the essential tasks of any position that falls within the sedentary strength level of work."  (*Id.* at 1740).

After considering Ms. Hayes opinion, Reliance determined that "it is our position that your client's medical records as well as the independent physician reviews conducted as part of

this appeal investigation do not support Ms. Hayes' conclusion that your client is disabled from performing Any Occupation of a sedentary nature." (*Id.* at 324). Reliance is entitled to weigh the evidence presented and resolve any conflict. *See Townsend*, 295 F. App'x at 977. Here, Ms. Hayes did not have the benefit of the opinions of Dr. Danzig and Dr. Arias before completing her report. Thus, just as Reliance did not adopt Ms. Vroman's REA, it was entitled to consider but not rely on Ms. Hayes' report because she did not have all the medical evidence in front of her. Reliance determined that the medical records, Dr. Arias' opinion, and Dr. Danzig's opinion do not support Ms. Hayes' conclusion that Plaintiff could not perform work at the sedentary exertional level. (AR at 324). The Undersigned finds that Reliance was not *de novo* wrong in its consideration of the vocational expert reports.

### e.   Conclusion Under the *De Novo* Review Standard

The Undersigned finds that Reliance properly weighed the evidence in the administrative record, including Plaintiff's treating physician's opinions, the fully favorable Social Security decision, Dr. Danzig's opinion, Dr. Arias' opinion, and the vocational expert reports. Reliance relied heavily on both Dr. Arias' and Dr. Danzig's opinions that Plaintiff can perform work at the sedentary level with some limitations and supported its decision not to adopt Plaintiff's treating physicians' opinions, the fully favorable Social Security decision, and Plaintiff's vocational expert's opinion. The Undersigned finds that Reliance is not *de novo* wrong in its conclusion that Plaintiff can perform work at the sedentary level.

Under the Eleventh Circuit's six-step analysis, a finding that a claim administrator's decision was not *de novo* wrong ends the inquiry in favor of the claim administrator. *Blankenship*, 644 F. 3d at 1355. Nevertheless, because this matter is submitted on a Report and

Recommendation, the Undersigned will proceed to the second and third steps of the inquiry to determine whether the decision was arbitrary and capricious.

### B.  Arbitrary and Capricious Review of Reliance's Decision

In this case, the parties agree – and the Court also agrees – that the plan administrator had discretion in reviewing the claims.  (Doc. 21 at 2; Doc. 22 at 1).  Because the Court finds the plan administrator had discretion, the Court moves to the third prong of the analysis, namely, whether "reasonable" grounds support the administrator's decision under a more deferential arbitrary and capricious standard.  *Blankenship*, 644 F.3d at 1355.

"Under the arbitrary and capricious standard of review, the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator when he or she made the decision.  *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1288 (M.D. Fla. 2013), *aff'd*, 563 F. App'x 658 (11th Cir. 2014) (citing *Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 976 (11th Cir. 2008)).  Thus, even if a claim administrator's decision is wrong, the decision will not be subject to reversal unless it is unreasonable.  *Manning v. Johnson & Johnson Pension Comm.*, 504 F. Supp. 2d 1293, 1303 (M.D. Fla. 2007).

### 1.  Discussion

For the same reasons articulated above, the Undersigned finds that Reliance's decision to terminate Plaintiff's LTD benefits is reasonable and not arbitrary and capricious.  Reliance supported its decision by relying mainly on the opinions of Dr. Danzig and Dr. Arias to determine that Plaintiff could return to his regular occupation as well as other jobs at the sedentary level, especially given the non-demanding standard under the terms, "Any Occupation."  (AR at 323-24); *see also Schindler*, 141 F. Supp. 2d at 1082.  Reliance weighed

the evidence and supported its decision by relying on the independent assessments of Dr. Danzig and Dr. Arias who found Plaintiff's capable of working at the sedentary level.  It is not unreasonable, arbitrary, or capricious for a plan administrator to give more weight to independent medical providers over a plaintiff's own doctors when opinions differ.  *Blankenship*, 644 F.3d at 1356.  The Undersigned finds that Reliance had a reasonable basis for its decision, based upon the facts known to it at the time of final decision.

Under the arbitrary and capricious standard, the Court next must consider whether there is a conflict of interest.  *Id.* at 1355.  If a conflict exists, the conflict is "merely" a factor for the court to consider when determining if the administrator's decision was arbitrary and capricious.  *Id.*  The burden remains with Plaintiff to show that the decision was arbitrary and it is not the administrator's burden to prove that its decision "was not tainted by self-interest."  *Ness*, 257 F. Supp. 3d at 1288; *see also Blankenship*, 644 F.3d at 1357.

Plaintiff argues that his LTD benefits have a net value of over $10,000.00 per month after the offset for Social Security Disability benefits.  (Doc. 26 at 21).  Plaintiff claims that his Policy could potentially be payable until May 27, 2032.  (*Id.*).  Plaintiff argues that this amount, coupled with Reliance making the eligibility and benefits decisions, gives rise to a conflict.  (*Id.*).

A large amount of money being at issue does not alone give rise to a conflict of interest.  *Blankenship*, 644 F.3d at 1357.  Thus, the Court turns to Plaintiff's other arguments regarding a conflict.

Plaintiff argues that Reliance's decision is unreasonable in light of its conflict of interest.  (Doc. 26 at 21).  Plaintiff claims that Reliance:  (1) failed to conduct a no-deference review; (2) failed to review properly its own evidence; (3) disregarded Plaintiff's evidence; and (4) did not give the fully favorable decision of the Social Security Administration due weight.  (*Id.*).

Plaintiff claims that a conflict exists because Reliance makes both the eligibility decisions and pays awarded benefits out of its own funds.  (*Id.*).

All of Plaintiff's arguments are recycled from the arguments addressed *supra* in Part III.A and are resolved in Reliance's favor for the same reasons articulated above.  First, Plaintiff argues that a conflict exists because Reliance failed to conduct a no-deference review.  (Doc. 26 at 23).  As determined above, this argument is unpersuasive based upon what Reliance actually said in the letter detailing its decision.  (AR at 313-26).

Second, Plaintiff asserts that Reliance failed to review properly its own evidence.  (Doc. 26 at 21-22).  Again, as explained above in great detail, Reliance considered and weighed the medical evidence of record, including its own evidence, before rendering a decision.  (*Id.*).

Third, Plaintiff claims that Reliance disregarded Plaintiff's evidence.  (Doc. 26 at 22-23).  Plaintiff contends that Reliance improperly relied on Ms. Vroman's Residual Employability Analysis because Ms. Vroman did not have the benefit of Dr. Arias' Neuropsychological Evaluation prior to completing her report.  (*Id.* at 22).  Thus, Plaintiff claims that an improper motive may be inferred to Reliance when it determined that Plaintiff is capable of performing work at the sedentary level and specifically the jobs listed in its February 2, 2017 denial letter.  (*Id.* at 23).  As explained above, Reliance considered Ms. Vroman's Residual Employability Analysis, but recognized that Ms. Vroman did not have the benefit of Dr. Arias' Neuropsychological Evaluation.  (AR at 323).  However, Reliance then based its decision on Dr. Danzig's and Dr. Arias' opinions when determining Plaintiff was capable of sedentary work.  (*Id.*).  Dr. Arias determined that Plaintiff had "no neuropsychological restrictions or limitations for return to work."  (*Id.* at 1873).  Importantly, Dr. Arias completed a check list form, indicating that Plaintiff had no limitations from a neuropsychological standpoint, including no limitations in

directing, controlling, or planning activities with others.  (*Id.* at 1874-75).  Thus, Dr. Arias did

not find Plaintiff limited from a neuropsychological perspective, including cognitively.  The

Undersigned finds that Reliance properly considered the vocational information, Dr. Danzig's

opinion, and Dr. Arias' opinion, in determining that Plaintiff is capable of performing the jobs

listed in the February 2, 2017 letter.

Fourth, Plaintiff claims that Reliance did not give the fully favorable decision by the

Social Security Administration due weight.  (Doc. 26 at 21).  As the Court stated above, Reliance

considered and weighed the fully favorable decision by the Social Security Administration, but

based its determinations on Dr. Danzig's and Dr. Arias' opinions that were not before the Social

Security Administration.  (*Id.* at 325).  Further, as stated above, a Social Security determination

is not dispositive of whether Plaintiff qualified for disability under the terms of the Policy here.

*See Oliver*, 613 F. App'x 897.  Reliance distinguished the Social Security decision based on the

medical records, the period of time considered, and the differences between the Social Security

guidelines and the Policy guidelines.  (AR at 325).  The Undersigned finds that Plaintiff did not

demonstrate any bias by Reliance in its consideration of Plaintiff's Social Security decision.

The Undersigned finds that even if a conflict exists, Reliance's decision was not arbitrary

and capricious.

## 2.      Conclusion Under the Arbitrary and Capricious Review Standard

It is not for the Court to determine whether Reliance's decision was "absolutely correct in

reality."  *See Blankenship*, 644 F.3d at 1357.  The Undersigned determines that Reliance's

decision was based on reasonable grounds, even assuming, *arguendo,* that a conflict of interest

exists.  Accordingly, the Undersigned finds that Reliance based its final decision on reasonable

grounds and was not arbitrary and capricious.

IV.     **Conclusion**

Based on the foregoing, it is respectfully **RECOMMENDED**:

1)  Defendant's Motion for Summary Judgment (Doc. 25) construed as a Motion for
    Judgment on the Record be **GRANTED**.

2)  Plaintiff's Motion for Summary Judgment (Doc. 26) construed as a Motion for
    Judgment on the Record be **DENIED**.

Respectfully recommended in Chambers in Ft. Myers, Florida on July 24, 2018.

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

**<u>NOTICE TO PARTIES</u>**

A party has fourteen days from this date to file written objections to the Report and
Recommendation's factual findings and legal conclusions.  A party's failure to file written
objections waives that party's right to challenge on appeal any unobjected-to factual finding or
legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir.
R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties